Jacob W. BEENTJES, Plaintiff,

v.

PLACER COUNTY AIR POLLUTION
CONTROL DISTRICT, and Does
1–20, inclusive, Defendants.

No. CIV. S–00–1423FCD JFM.

United States District Court,
E.D. California.

March 27, 2003.

Roderick P. Bushnell, Bushnell, Caplan & Fielding, LLP, San Francisco, CA, Linda J. Sloven, Attorney at Law, Nevada City, CA, for Plaintiff.

Mathew D. Evans and James B. Carr, Duncan, Ball & Evans, Sacramento, CA, for Defendant.

## MEMORANDUM AND ORDER

DAMRELL, District Judge.

This action is brought by plaintiff Jacob W. Beentjes against the Placer County Air Pollution Control District ("defendant" or the "district") alleging that it unlawfully discriminated against him based on his disability and failed to reasonably accommodate him in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* The district moved for summary judgment on the grounds that it is a sovereign entity immune from suit by private citizens in federal court under the Eleventh Amendment. The court denied the district's motion by order filed December 23, 2002. The district now seeks reconsideration of the court's December 23, 2002 order.

## I.

## BACKGROUND

Plaintiff was hired by Placer County as an Air Pollution Control Specialist II in April 1992 to work for the Placer County Air Pollution Control District. (Pl.'s Opp'n to Statement of Undisputed Facts in Supp. of Def.'s Mot. for Summ. J. ("UF"), filed Dec. 5, 2002, UF 1.) On April 23, 1997, plaintiff was diagnosed with Chronic Obstructive Pulmonary Disease. (Compl., filed June 30, 2000, ¶ 5.) Plaintiff's disease prevents him from walking more than short distances without becoming short of breath, and also prevents him from engaging in any kind of strenuous activity. (UF 2; Compl. ¶ 5.)

Due to his illness, plaintiff eventually exhausted his sick leave, vacation, and other approved time off, and was thereafter taken off the active payroll list of the County of Placer and placed on permanent disability by the California Public Retirement System. (UF 3.) Plaintiff was notified of defendant's position that he was unable to perform the "essential functions" of his job, and that he would be terminated once his administrative leave benefits were exhausted. (UF 4.) Plaintiff was additionally informed of his right to file an appeal to the Placer County Civil Service Commission. (*Id.*)

In January 1999, plaintiff was notified by the Public Employees Retirement System, Benefit Application Services Division that his application for disability retirement had been approved. (UF 5.) Having filed an administrative complaint with the Equal Employment Opportunity Commission (the "EEOC"), plaintiff received a right to sue letter on May 30, 2000. (UF 6.) Plaintiff additionally received a "determination" from the EEOC finding that defendant failed to provide plaintiff with reasonable accommodations and that there

was reasonable cause to believe plaintiff was discriminated against because of his disability. (Decl. of Jacob W. Beentjes in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Beentjes Decl."), filed Dec. 5, 2002, ¶ 10, Ex. 7.)

Plaintiff filed this action on June 30, 2000, asserting two claims for relief. Plaintiff alleges that he was unlawfully discriminated against based on his disability, and that defendant failed to reasonably accommodate him, in violation of the ADA.

## II.

## STANDARD

A motion for reconsideration brought under Federal Rule of Civil Procedure[1] 59(e) must be filed no later than 10 days after entry of judgment. Fed.R.Civ.P. 59(e). However, the court may construe an untimely motion for reconsideration brought under Rule 59(e) as a motion based on Rule 60(b). *United States v. Iron Mountain Mines*, 812 F.Supp. 1528, 1555 (E.D.Cal.1993). A motion under Rule 60(b) may not be made unless the order to be reconsidered is a final ruling from which an appeal can be taken. *See id.*; Adv. Comm. Note to 1946 Amend. to Fed. R.Civ.P. 60(b).

Absent "highly unusual circumstances," reconsideration under Rule 60(b) is generally appropriate only where (1) there is an intervening change in the controlling law, (2) the court is presented with newly discovered evidence, or (3) the court committed clear error or the initial decision was manifestly unjust. *See United States v.*

*Westlands Water Dist.*, 134 F.Supp.2d 1111, 1131 (E.D.Cal.2001); *School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir.1993). Rule 60(b) specifically provides that:

> On motion and upon such terms as are just, the court may relieve a party . . . from a final . . . order . . . for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b) . . . or (6) any other reason justifying relief from the operation of the judgment.

Fed.R.Civ.P. 60(b).

A motion for reconsideration "is not a vehicle to reargue the motion or to present evidence which should have been raised before." *Westlands Water Dist.*, 134 F.Supp.2d at 1131. In addition, in order for evidence to be considered "new" for the purposes of Rule 60(b), it must be of such a character that it would likely change the outcome of the court's prior decision. *See Fernhoff v. Tahoe Reg'l Planning Agency*, 622 F.Supp. 121, 122 (D.Nev.1985).

## III.

## ANALYSIS

### A. Reconsideration of the Court's Order[2]

Because defendant has sought reconsideration after expiration of the 10

---

1. Any further references to a "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise indicated.

2. Defendant's motion, brought pursuant to both Rule 59 and 60, is titled "Notice of Motion and Motion to Alter Order and/or Motion for New Trial and/or Motion for Reconsideration." While defendant periodically re-

quests a "new trial" in addition to relief from the court's December 23, 2002 order throughout its motion, the court notes that no trial has taken place in this action. Thus, the court disregards defendant's request for a new trial and interprets defendant's motion as one for reconsideration pursuant to either Rule 59(e) or 60(b).

day deadline set out in Rule 59(e), it must satisfy the standards of Rule 60(b). *See* Fed.R.Civ.P. 59(e). As a threshold matter, an order denying a motion for summary judgment is generally not a final and appealable order within the scope of Rule 60(b); rather, it is an interlocutory order. *See Iron Mountain Mines,* 812 F.Supp. at 1556. However, in this instance, the denial of defendant's motion for summary judgment resulted in a denial of the defense of sovereign immunity. Because such a determination conclusively resolves an important issue independent of the subject matter of the litigation, and is effectively unreviewable on appeal from a final judgment in the action, it is treated as a "final" order and is thus appealable under the "collateral order" doctrine. *See State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell,* 138 F.3d 784, 786 (9th Cir.1998). Accordingly, in light of the court's holding that the district could not invoke Eleventh Amendment immunity, defendant's motion for reconsideration is properly construed as one seeking relief from a final order pursuant to Rule 60(b).

The court is persuaded that reconsideration is justified in this instance. In addition, the court has independently determined that its decision merits a second look. *See Iron Mountain Mines,* 812 F.Supp. at 1556. Thus, "in order to assure that its decision on the question is the best it can make," the court revisits the sovereign immunity issue below. *Id.*

**B. The Clean Air Act**

The federal Clean Air Act (the "CAA") was enacted by Congress in 1970 to establish a joint state and federal program to control air pollution. *See Western Oil and Gas Assoc. v. United States E.P.A.,* 767 F.2d 603, 604 (9th Cir.1985). In enacting the CAA, Congress found that while federal financial assistance and leadership are necessary to development of the program, "air pollution prevention ... and air pollu-

tion control at its source is the primary responsibility of State and local governments." 42 U.S.C. §§ 7401(a)(3), (a)(4). The CAA requires the federal Environmental Protection Agency (the "EPA") to set national ambient air quality standards ("NAAQS"), and further requires each state to adopt a state implementation plan ("SIP") to achieve those NAAQS within the state's designated air quality control regions. *See id.* §§ 7407–7410. The SIPs must comply with all of the requirements of the CAA and must be submitted to the EPA for approval. *Id.* § 7410. Once the EPA approves an SIP, its requirements and commitments become binding upon the state as a matter of federal law. *Id.* § 7413(a)(2). While the states are bound by their respective SIPs under the CAA, they are also free to adopt their own air pollution control standards so long as they are no less stringent than those required by the CAA. *Id.* § 7416.

The CAA was amended in 1977 in order to establish a more detailed system of air quality planning and management. *See Western Oil and Gas,* 767 F.2d at 604–05; *Communities For A Better Env't v. Cenco Refining Co.,* 180 F.Supp.2d 1062, 1068 (C.D.Cal.2001). The amendments set forth more rigorous requirements for those geographical areas that had failed to meet federal air quality standards ("nonattainment areas"). *See* 42 U.S.C. §§ 7501–7508. In addition, the amendments permitted the states to redesignate their air quality control regions for purposes of more efficient and effective air quality management. *Id.* § 7407(e)(1).

**C. California Health & Safety Code Section 40000 *et seq.***

In California, air quality standards and limitations are governed by both the CAA and state and local air quality laws. The California Legislature has determined that

local and regional authorities have the primary responsibility for control of air pollution from all sources other than emissions from motor vehicles. Cal. Health & Safety Code § 40000. The California Health and Safety Code establishes Air Pollution Control Districts ("air pollution control districts" or "districts"), which are empowered to adopt and enforce rules and regulations designed to achieve and maintain federal and state ambient air quality standards for the areas under their jurisdiction. *Id.* §§ 40001–40002; *see Dunn–Edwards Corp. v. South Coast Air Quality Mgmt. Dist.*, 19 Cal.App.4th 536, 24 Cal. Rptr.2d 99, 103 (1993). Most districts are created on a county-by-county basis.[3] Cal. Health & Safety Code § 40002. Defendant in this action, the Placer County Air Pollution Control District, is one such district.[4]

## D. Sovereign Immunity

 The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. It is well-established that "[t]he Eleventh Amendment ... prohibits federal courts from hearing suits brought by private citizens against state governments, without the state's consent." *Natural Res. Def. Council v. Cal. Dep't of Transp.*, 96 F.3d 420, 421 (9th Cir.1996). For purposes of the Eleventh Amendment, state departments and agencies are treated as "state governments" entitled to sovereign immunity.

*See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). However, the Eleventh Amendment's protections "do[ ] not extend to counties and similar municipal corporations." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Thus, in certain instances, the applicability of sovereign immunity turns on whether a particular agency is "more like a county or city than it is like an arm of the state." *Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. 568. In the action presently before this court, the Placer County Air Pollution Control District argues that it is an "arm of the state" subject to the protections of the Eleventh Amendment. (*See* P. & A. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s MSJ"), filed Sept. 24, 2002, at 4.)

In determining whether an entity is an arm of the state for the purposes of invoking sovereign immunity, the Supreme Court has provided the following general guidance:

> When deciding whether a state instrumentality may invoke the State's immunity, our cases have inquired into the relationship between the State and the entity in question. In making this inquiry, we have sometimes examined "the essential nature and effect of the proceeding," and sometimes focused on the "nature of the entity created by state law" to determine whether it should "be treated as an arm of the State." Of course, the question whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance

---

3. There are also a few districts in California that fall into a regional, unified, or other special district. Cal. Health & Safety Code § 40002.

4. In California, the state agency charged with coordinating efforts to reach and maintain ambient air quality standards, and to conduct research into causes of and solutions to air pollution is the California State Air Resources Board (the "CARB"). Cal. Health & Safety Code § 39003.

to any evaluation of the relationship between the State and the entity or individual being sued.

*Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429–30, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997) (citations omitted).

More specific direction can be found in the following excerpt from the concurring opinion of Justices Brennan, Marshall, Blackmun, and Stevens in *Port Authority Trans–Hudson Corp. v. Feeney:*

> The rule to be derived from our cases is that the Eleventh Amendment shields an entity from suit in federal court only when it is so closely tied to the State as to be the direct means by which the State acts, for instance a state agency. In contrast, when a State creates subdivisions and imbues them with a significant measure of autonomy, such as the ability to levy taxes, issue bonds, or own land in their own name, these subdivisions are too separate from the State to be considered its "arms." This is so even though these political subdivisions exist solely at the whim and behest of their State.

495 U.S. 299, 313, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) (Brennan, Marshall, Blackmun, and Stevens, J., concurring in part and concurring in judgment) (citation omitted).

 In order to determine whether an agency is an arm of the state for Eleventh Amendment immunity purposes, the Ninth Circuit applies a "multi-factored balancing test." *Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 250 (9th Cir.1992); *Mitchell v. L.A. Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir.1988). That test involves an analysis of the following five factors: [1] whether a money judgment would be satisfied out of state funds, [2] whether the entity performs central governmental functions, [3] whether the entity may sue or be sued, [4] whether the entity has the power to take property in its own name or only the name of the state, and [5] the corporate status of the entity.

*Belanger,* 963 F.2d at 250–51; *Mitchell,* 861 F.2d at 201. These factors must be analyzed "in light of the way California law treats the governmental agency." *Belanger,* 963 F.2d at 251. In addition, the first factor has been identified as predominant in determining whether a governmental agency is an arm of the state. *Jackson v. Hayakawa,* 682 F.2d 1344, 1350 (9th Cir. 1982) (quoting *Ronwin v. Shapiro,* 657 F.2d 1071, 1073 (9th Cir.1981)).

### 1. Whether a Money Judgment Would be Satisfied Out of State Funds

 The "most crucial question" in determining whether the district is a state agency for Eleventh Amendment purposes is "whether the named defendant has such independent status that a judgment against the defendant would not impact the state treasury." *Id.*

The parties have submitted conflicting evidence regarding the source of the funds that would be used to satisfy a money judgment for plaintiff in this case. In response to plaintiff's request for certain documents identifying whether such funds would be replenished by the State, defendant responded as follows: "The District's liability insurance will cover any judgment, without the necessity of withdrawing any 'District funds.'" (Decl. of Roderick P. Bushnell in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Bushnell Decl."), filed Dec. 5, 2002, at Ex. G.) In response to an interrogatory, defendant further explained:

> [The Placer County Air Pollution Control District] has $2 million in liability insurance coverage, which should be sufficient to satisfy a judgment in this case. Said insurance includes a $500,000 primary self-insured component through the Special District Risk Management

Authority, the premiums for which would come out of the District's budget, regardless of the source of the fund. It is unknown, if the District would have the right to seek reimbursement from the State of California, because it would first look to Placer County for replacement of said funds. (Bushnell Decl. at Ex. G.) Thus, the district has admitted that funds used to satisfy a judgment in this case would be replenished by Placer County, not the State. However, because the judgment would initially be satisfied through the district's insurance coverage, and the district's insurance premiums are paid from its budget, the court must next determine how the district's budget is funded.

#### a. The "State Vehicle Surcharge"

California Health and Safety Code section 40701.5 provides a basic outline of funding sources for air pollution control districts:

(a) Funding for a district may be provided by, but is not limited to, any one or any combination of the following sources:

(1) Grants.

(2) Subventions.

(3) Permit fees.

(4) Penalties.

(5) A surcharge or fee pursuant to Section 41081 or 44223 on motor vehicles registered in the district.

(b) Expenses of a district that are not met by the funding sources identified in subdivision (a), shall be provided by an annual per capita assessment on those cities which have agreed to have a member on the district board ... and on the county or counties included within the district. Any annual per capita assessment imposed by the district on those cities and counties included within the district shall be imposed on an equitable per capita basis.

Cal. Health & Safety Code § 40701.5.[5]

Defendant asserts that state revenues—primarily in the form of a "state vehicle surcharge" permitted by Health and Safety Code section 40701.5(a)(5)—comprise over 50% of the Placer County Air Pollution Control District's total budget. (Def.'s MSJ at 6.) However, plaintiff has submitted the deposition testimony of the district's former Air Pollution Control Officer (the "Officer"), which contradicts this assertion. The Officer has testified that the "state vehicle surcharge" is actually paid by Placer County residents, and is imposed by the district, at the discretion of the district, on vehicles licensed in Placer County. (Dep. of Richard Johnson, attached as Ex. J to Bushnell Decl. ("Johnson Dep."), at 52–54, Ex. 3.) The Officer has further testified that while the surcharge is collected by the Department of Motor Vehicles (the "DMV"), it is thereafter disbursed to the district. (Johnson Dep. at 55–57, Ex. 3.)

A review of the statutory scheme confirms the accuracy of the Officer's testimony. Districts are authorized to impose a state vehicle surcharge pursuant to California Health and Safety Code section 44223, which provides that a district designated as a state nonattainment area for any pollutant emitted by motor vehicles may levy a fee up to a certain amount on motor vehicles registered within that district. Cal. Health & Safety Code § 44223. However, once the district elects to impose a surcharge, the local board is required to adopt a resolution providing for the fee and for a corresponding program of air pollution reduction from motor vehicles in connection with the implementation of the

**5.** Each district is required to hold a public hearing for purposes of reviewing its budget. Cal. Health & Safety Code § 40131.

California Clean Air Act of 1988. *Id.* Nevertheless, districts which qualify under section 44223 are empowered to impose the state vehicle surcharge at their own discretion.

The DMV's role in collecting the state vehicle surcharge is described in California Health and Safety Code section 44227. This section provides that upon the request of a district, the DMV is required to collect the fees established by the district pursuant to section 44223 upon the renewal of the registration on any motor vehicle registered in that district. *Id.* § 44227. Thus, the DMV is required by the State to collect the surcharge imposed by the districts. The DMV is only entitled to keep enough of the revenue collected to cover its administrative costs incurred through the collection process, and the remainder of the revenue is thereafter disbursed back to the districts. *Id.* § 44229. The disbursement scheme is based upon the amount of fees collected from motor vehicles registered within each district. *Id.* In sum, the DMV's role is administrative, and the surcharge proceeds minus collection costs are ultimately returned to the districts.

Therefore, while the title of the "state vehicle surcharge" suggests that the source of that revenue is state funds, such is not the case. When analyzed more closely, the surcharge is actually a local vehicle tax imposed on Placer County residents, by the district at its discretion. Thus, the portion of the district's budget that is funded by the state vehicle surcharge is not derived from the state treasury.

### b. Other Revenue Sources

Besides the state vehicle surcharge, other sources of revenue for the district include: (1) permit revenues paid for by persons or businesses located within Placer County (Johnson Dep. at 42–44, Ex. 3); (2) air pollution fines (*Id.* at 49, Ex. 3); (3) interest from monies held in a reserve account (*Id.*); (4) Air Toxic Hot Spots Act fees paid by local persons or businesses (*Id.* at 55–57, Ex. 3); (5) state subvention funds (*Id.* at 51, Ex. 3); (6) state aid funds (*Id.* at 52, Ex. 3); and (7) various other miscellaneous sources (*Id.* at Ex. 3).[6]

The permit revenues, air pollution fines, interest from reserve accounts, and Air Toxic Hot Spots Act fees are all revenues that are local in nature. (*See id.* at 42–44, 49, 55–57, Ex. 3.) Only the "state subvention funds" and "state aid funds" include revenue gathered from the State.[7] Thus,

6. The Placer County Air Pollution Control District's 2000–01 budget provides an example of the district's typical sources of revenue. The budget is broken down into three general categories: (1) *Permits & Fines;* (2) "State" Revenue; and (3) "Other" Revenue. (Johnson Dep. at Ex. 3.) For purposes of determining how much of the district's revenue is gathered from the State, the court is primarily concerned with those sources the district has explicitly included in its "Total State Revenue" category.

7. California Health & Safety Code sections 39800 through 39811 govern the Air Pollution Control Subvention Program. Sections 39802 through 39804 provide that the California Air Resources Board (the "CARB") *"may*

subvene" certain funds to the districts subject to numerous limitations. Cal. Health & Safety Code §§ 39802–39804 (emphasis added). Those sections further provide minimum and maximum *State subvention guidelines. Id.* Additional sources of state funding are outlined in Health & Safety Code sections 44299.50 through 44299.55, which govern the Sacramento Emergency Clean Air and Transportation Program. Pursuant to that program, the *Placer County Air Pollution Control District* may be eligible for grants related to projects to reduce onroad nitrogen oxide emissions. *Id.* §§ 44299.50–44299.51. This program was created to benefit the "Sacramento Region Districts," one of which is the *Placer County Air Pollution Control District,* due to the region's unique "serious and severe

for example, in fiscal year 1998–99, the district's total revenues were $1,100,844. (*Id.* at Ex. 3.) Of that amount, approximately $66,157 was received from the State through subvention and aid funds. (*Id.*) Therefore, according to the court's rough calculations, after excluding the "state vehicle surcharge," approximately 6% of the district's budget was funded by the State in 1998–99. Similar approximate calculations for recent fiscal years are as follows: 7.5% for 1997–98; 7% for 1996–97; 9.5% for 1995–96; and 8% for 1994–95. (*See id.*) The remainder of the district's budget is derived from local revenues.

In support of its argument that where a special district like the Placer County Air Pollution Control District is funded by both local and state revenues, "the local character of the revenues is deemed lost," defendant cites to the Ninth Circuit's opinions in *Mitchell* and *Belanger.* (Def.'s MSJ at 6.) However, defendant ignores the fact that the analyses set forth in *Mitchell* and *Belanger* specifically address the unique nature of funding of public schools in California. *See Belanger,* 963 F.2d at 252 n. 3 (finding that "state and local funds are interchangeable and hopelessly commingled *under California's school funding system* ") (emphasis added).

Unlike air pollution control districts, "California has assumed total control over the funding of public schools." *Id.* at 253. Public schools in California have budgets that are controlled and funded by the State pursuant to a state calculated formula. *See id.* at 251–53. The State sets revenue limits for each school and "determines the amount of money that school districts may spend per pupil and then provides the necessary state funds." *Id.* at 252. In addition, the State has complete control over the amount of property tax revenue public school districts receive. *Id.* In contrast, air pollution control dis-

tricts are free to adopt their own budgets. *See* Cal. Health & Safety Code § 40701.5 (stating that district funding may be provided by, but is not limited to enumerated sources). California Health and Safety Code section 40701.5(b) further provides that any district expenses not met by grants, subventions, permit fees, penalties, and motor vehicle surcharges or fees are to be provided by the municipalities which have agreed to have a member sit on the district board, and the county or counties located within the district. *Id.* Thus, the funding of air pollution control districts is ultimately the responsibility of municipalities and counties, not the State. As such, the *Belanger* analysis, which is based on California's complete control over the funding of public schools, is not controlling in the context of air pollution control districts.

The factual circumstances in *Belanger* are further distinguishable from the case at hand. For example, any revenue used to satisfy a judgment in *Belanger* was to be supplanted by state funds. 963 F.2d at 252. In contrast, here, defendant has admitted that it would seek to replenish funds lost to a judgment in this case from Placer County, not the State. (Bushnell Decl. at Ex. G.) In addition, in contrast to California public schools, which receive 75% of their budget from the State, the Placer County Air Pollution Control District receives less than 10% (and in more recent years, as little as 6%) of its funding from the State. Thus, the facts underlying the *Belanger* opinion are not analogous to the facts underlying the present case.

In light of the minimal amount of state funding that goes into the district's budget, the source of funds for any judgment for plaintiff in this matter would not "impact the state treasury." *See Jackson,* 682 F.2d at 1350 (quoting *Ronwin v. Shapiro,*

air pollution problems." A.B. 2511, ch. 532, § 1(b), 1999–2000 Leg., Reg. Sess. (Ca.2000).

657 F.2d 1071, 1073 (9th Cir.1981)). Permitting localities to take advantage of Eleventh Amendment protection by simply gathering any portion of their funding from the State, no matter how negligible, would vastly expand the scope of sovereign immunity to agencies which operate almost entirely independent of the State and its financial support. Thus, the court finds that a judgment for plaintiff in this case would not be satisfied from state funds.

## 2. Whether the District Performs Central Governmental Functions

In order to determine whether an agency performs a central governmental function, the Ninth Circuit has looked to whether the purpose of the agency is to address statewide as opposed to local or municipal concerns, and whether it is treated as a state agency under State law. *See Belanger*, 963 F.2d at 253.

The control of air pollution, like public schooling, is undeniably a matter of statewide concern. However, both Congress and the State Legislature have concluded that air pollution is also a matter of local concern. 42 U.S.C § 7401(a)(3) ("[A]ir pollution prevention ... and air pollution control at its source is the primary responsibility of *States and local governments*") (emphasis added); Cal. Health & Safety Code §§ 39001–39002 ("Since air pollution knows no political boundaries, the Legislature declares that a regional approach to the [air pollution] problem should be encouraged whenever possible," and thus "[l]ocal and regional authorities have the primary responsibility for control of air pollution from all sources other than vehicular sources"). Thus, these findings alone do not answer the question of whether air pollution is primarily a statewide rather than local concern.

As a general matter, the California Legislature has adopted a statutory scheme wherein the State retains responsibility for regulation of vehicular ("mobile") sources of pollution, while the districts are assigned responsibility over all other ("stationary") pollution sources. Cal. Health & Safety Code §§ 39002, 40000. The purpose of this differentiated allocation is to permit local agencies to adopt rules "that appropriately reflect local air quality conditions and the local make-up of pollution sources." (Decl. of James B. Carr in Supp. of Def.'s Reply Brief for Mot. to Alter, for Reconsideration, and New Trial ("Carr Decl."), filed Feb. 7, 2003, Ex. E at 6.) This general framework suggests that the State recognizes that certain aspects of air pollution control are necessarily a highly localized function.

Each district is given significant latitude to adopt its own rules and regulations to "do such acts as may be necessary or proper to execute the powers and duties granted to, and imposed upon, the district ...." Cal. Health & Safety Code § 40702. Each district is granted the power to establish its own regulatory system for reducing emission of air contaminants. *Id.* § 40709. While each district's rules must be filed with the California Air Resources Board ("CARB"), *id.* § 40704, there appears to be no direct authority requiring CARB or State approval of the districts' regulations prior to their filing. And while the CARB has the power to "undertake control activities in any area wherein it determines that the local or regional authority has failed to meet [its] responsibilities," *id.* § 39002, the districts are permitted to establish stricter standards than those required by federal and state law, and thus retain considerable powers. *Id.*

A significant number of other organizational and operational aspects of the districts suggest that they function fairly autonomously from the State. For example, each district adopts its own budget, *id.* § 40131, and its own regulations, *id.*

§ 40702. The membership of the governing board of each district must include a number of municipal and county officers, but no State officers. *Id.* § 40704.5. Each district board controls the number of personnel to be employed by the district, as well as their duties and compensation, which is to be paid from the district's own funds.[8] *Id.* §§ 40705–40706. Finally, the ultimate responsibility for funding each district, if its expenses are not met, rests with the municipalities and counties whose officers sit on the district board. *Id.* § 40701.5. In sum, the State exercises little control over the structure and operation of the districts, which suggests that districts function independently from the State.

California case law interpreting the status of air pollution control districts is noticeably sparse.[9] Thus, the court must look elsewhere for guidance on this issue. Defendant argues that the Ninth Circuit's recent opinion in *United States v. Price* is determinative. (Notice of Mot. and Mot. to Alter Order and/or Mot. for New Trial and/or Mot. for Reconsideration ("Def.'s Mot. for Reconsideration"), filed Jan. 3, 2003, at 9–10.) In *Price,* the Ninth Circuit found that the Double Jeopardy Clause did not bar the defendant's federal criminal prosecution for a violation of the CAA, even though the defendant had been assessed a civil penalty for the same conduct by the Clark County, Nevada Health District—which serves as the air pollution control board within its jurisdiction—for a violation of regulations that mirror the federal standards. 314 F.3d 417, 418–19 (9th Cir.2002). In finding the Clark County Health District to be a separate sovereign with respect to the federal government, the Ninth Circuit stated that the district "was acting under state authority" in pursuing a civil enforcement action against the defendant. *Id.* at 421.

Although defendant places great weight on the Ninth Circuit's use of the phrase "state authority," the court finds such language hardly determinative of the issue before this court; namely whether districts are "state agencies" or "arms of the state" for purposes of Eleventh Amendment immunity. As the Supreme Court has made clear, "ultimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates." *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 47, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). Thus, the fact that the Ninth Circuit found that

**8.** In addition, all county officers and employees are ex officio officers and employees of the county district in the county by which they are employed. Cal. Health & Safety Code § 40120.

**9.** The parties have identified only one California case specifically addressing the governmental status of air pollution control districts as defined in California Health & Safety Code section 40700. In *People v. A–1 Roofing Service, Inc.,* the Appellate Department of the Superior Court of Los Angeles County explained:

> [California Health and Safety Code section 40700] only states the obvious; the SCAQMD and other such districts are not private agencies. This section does not declare that the district is a "state agency."

Similarly misplaced is defendant's reliance on section 40001 which calls for districts to adopt rules and regulations "subject to the powers and duties of the state board." The quoted language means only that the Air Resources Board maintains a superior position to that of local districts, so as to assure that their regulations do not conflict with its overall responsibilities and programs. The section does not make each district into a "state agency" ....

87 Cal.App.3d Supp. 1, 151 Cal.Rptr. 522, 528 (Dep't Super.Ct.1978). Thus, while the *A–1 Roofing* court does not address air pollution control districts' status in the context of a sovereign immunity analysis, its discussion, however, provides the only examination of section 40700 available from a California court.

the Clark County Health District was acting pursuant to "state authority" is unremarkable, as many such entities are creatures of the State, and thus necessarily "act under state authority." *See Edelman v. Jordan*, 415 U.S. 651, 668 n. 12, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) ("The fact that the county policies executed by the county officials in Griffin were subject to the commands of the Fourteenth Amendment, but the county was not able to invoke the protection of the Eleventh Amendment, is no more than a recognition of the long-established rule that while county action is generally state action for purposes of the Fourteenth Amendment, a county defendant is not necessarily a state defendant for purposes of the Eleventh Amendment."); *Feeney v. Port Auth. Trans-Hudson Corp.*, 873 F.2d 628, 630 (2d Cir. 1989) (finding that counties and municipalities exercise "slice of state power" insufficient to afford Eleventh Amendment protection).

Importantly, the Ninth Circuit reasoned in *Price* that "a state does not *act* under federal authority just because it chooses to adopt regulations that mirror the minimum federal standards," noting that the State "was free to adopt more stringent standards [than the federal standards] if it wished." 314 F.3d at 422 (emphasis in original). Here, the Placer Air Pollution Control District while acting under state authority is free to adopt standards more stringent than California's if it wishes. *See* Cal. Health & Safety Code § 39002 ("Except as otherwise provided in this division ... local and regional authorities may establish stricter standards than those set by law or by the state board for nonvehicular sources.").[10]

Importantly, however, the context of the discussion of sovereignty in *Price* is confined to the application of the Double Jeopardy Clause. Context is significant as doctrines applicable to different constitutional amendments are distinct, even though they may, at times, invoke similar language. As noted above, while counties may be considered "state actors" they are not entitled to the sovereign immunity of the state. *See Edelman*, 415 U.S. at 668 n. 12, 94 S.Ct. 1347. Similarly, while air pollution control districts may enjoy "sovereignty" separate and distinct from federal "sovereignty" under the Double Jeopardy Clause, such "sovereignty" does not ineluctably invoke sovereign immunity accorded to states under the Eleventh Amendment. The rights and status conferred by these constitutional amendments serve dissimilar purposes. Extrapolating principles from one for application to the other would seem, at best, an imprecise exercise. Thus, contrary to defendant's assertion, *Price*'s finding of district sovereignty under the Double Jeopardy Clause does not compel a finding in this case of state sovereign immunity. Rather, *Price* simply explains the tripartite scheme contemplated by the CAA, wherein air pollution control is the responsibility of federal, state, and local agencies, and that under state authority a local agency exercises sovereignty *apart* from the federal government. 314 F.3d at 421–22. Accordingly, the court finds *Price* is not authority for the proposition that air pollution control districts must be deemed "arms of the state" for purposes of Eleventh Amendment immunity.

Nor does *Price* even serve as a persuasive analogy to the case at hand. On many

---

**10.** While the court in *Price* refers to the Clark County Health District and the federal government as separate sovereigns, it is unlikely a district and the State Board would be considered separate sovereigns if each undertook an enforcement action against a person or entity for the same offense. Certainly, a county district attorney would not represent a "sovereign" apart from the state attorney general if both prosecuted a defendant for the same offense.

occasions, the Supreme Court has enunciated the principle that while sovereign immunity extends to states, it does not extend to counties, cities, towns, and other similar municipal corporations. *Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. 568; *Edelman*, 415 U.S. at 668 n. 12, 94 S.Ct. 1347; *Lincoln County v. Luning*, 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890). The Court in *Mt. Healthy* and *Edelman* implicitly adopted the reasoning of its prior decision in *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), which addressed the status of California counties relative to the State for purposes of diversity jurisdiction. *Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. 568; *Edelman*, 415 U.S. at 668 n. 12, 94 S.Ct. 1347. In concluding that California counties maintain an independent status from the State, *Moor* rejected the County's position that, under California law, it was "nothing more than an agent or a mere arm of the State itself." 411 U.S. at 718–19, 93 S.Ct. 1785. Among other considerations, the Court noted that under California law, a county is designated a "body corporate and politic," that a county may sue and be sued, and that a county may buy, sell, and otherwise deal in property. *Id.* at 719–20, 93 S.Ct. 1785. The Court found these factors to be "persuasive indicia of the independent status occupied by California counties relative to the State of California." *Id.* at 720, 93 S.Ct. 1785.

The statutory scheme applicable to air pollution control districts is analogous. Like counties, under California law districts are defined as "bodies corporate and politic," and like counties, districts may sue and be sued, and may buy, sell, and otherwise deal in property. Cal. Health & Safety Code §§ 40700–40701. Thus California districts, like California counties, exer-

cise an "independent status ... relative to the State of California." *Moor*, 411 U.S. at 720, 93 S.Ct. 1785. In light of the reasoning in *Moor*, this analogy is persuasive.

In sum, a review of the applicable statutory framework reveals that, while districts derive their authority from the State, they are granted wide latitude to conduct their affairs as they see fit, so long as they maintain standards at least as stringent as those adopted by the State. The framework further reflects the regional nature of air pollution itself by allowing districts the freedom to adopt rules that address the air quality problems emanating from local stationary sources. *See* Cal. Health & Safety Code §§ 39001–39002; Carr Decl. at Ex. E. As such, the districts are less "arms of the state" than they are autonomous local agencies akin to counties and municipalities when acting under state authority. Thus, the court finds that, on balance, the district performs local and regional rather than statewide governmental functions.

Accordingly, in light of the persuasive reasoning in *Moor* and the state statutory framework, this factor weighs against a finding of Eleventh Amendment immunity.

### 3. Whether the District May Sue or Be Sued

California Health and Safety Code section 40701 enumerates the powers granted to air pollution control districts. Among those powers is the power "[t]o sue and be sued in the name of the district in all actions and proceedings in all courts and tribunals of competent jurisdiction." Cal. Health & Safety Code § 40701(b). Thus, this factor weighs against a finding of Eleventh Amendment immunity. *See Belanger*, 963 F.2d at 254.[11]

---

11. In its moving papers, defendant mistakenly argues in support of plaintiff's position on the issue of whether the district can sue or be sued in its own name. (*See* Def.'s MSJ at 8–9.)

### 4. Whether the District Has Power to Take Property in Its Own Name or Only the Name of the State

Defendant concedes that the district has power to take property in its own name, citing California Government Code section 61611, which states: "A district may hold, use, enjoy, lease or dispose of any of its property." (*See* Def.'s MSJ at 10.) While defendant goes on to state that the statute also provides that a district's property is considered to be "beneficially owned by the state since the District is performing governmental functions upon it," the statute contains no such qualification. (*Id.*) Further, defendant cites no law to support this proposition.

It also appears to the court that there exists a more specific provision delineating air pollution control districts' powers with regard to property ownership. Among the powers granted to districts under California Health and Safety Code section 40701 is the following: "To take by grant, purchase, gift, devise, or lease, to hold, use, and enjoy, and to lease or dispose of any real or personal property within or without the district necessary to the full exercise of its powers." Cal. Health & Safety Code § 40701(d). While this provision does not explicitly state that property may be taken in a district's own name, such a right is implicit in the extensive nature of the powers enumerated under that section. Thus, the district's broad powers regarding the taking of property weigh against a finding of Eleventh Amendment immunity. *See Belanger,* 963 F.2d at 254.

### 5. The Corporate Status of the District

As discussed above, the Health and Safety Code defines an air pollution control district as a "body corporate and politic and a public agency of the state." Cal. Health & Safety Code § 40700.

While "a body corporate and politic" suggests that a district is a distinct corporate and political entity, the phrase "a public agency of the State" suggests otherwise.[12] In contrast to this seemingly contradictory statement, the Legislature has unambiguously declared that the CARB is a "state agency." Cal. Health & Safety Code § 39003 ("The [CARB] is the *state agency* charged with coordinating efforts to attain and maintain ambient air quality standards . . . .") (emphasis added). While too much weight should not be accorded to this contrast, it might be reasonable to infer that the California Legislature intended to assign districts a different status than the CARB.

In fact, the only known California case to interpret the language of section 40700 found that the statute's intent is not to create "state" agencies, but rather to simply establish that districts are "public" agencies. *See A–1 Roofing,* 151 Cal.Rptr. at 528. The court finds that this is a

---

12. *See Hutchison v. Lake Oswego Sch. Dist. No. 7,* 519 F.2d 961, 967 (9th Cir.1975) (considering school districts' definition as "bodies corporate" in concluding school district was not arm or alter ego of state), *remanded on other grounds,* 429 U.S. 1033, 97 S.Ct. 725, 50 L.Ed.2d 744 (1977); *Magula v. Broward Gen. Med. Ctr.,* 742 F.Supp. 645, 649 (S.D.Fla. 1990) (taking into account conveyance to district's board of commissioners all powers "of a body corporate" in concluding that hospital district is not entitled to Eleventh Amendment immunity); *Kenny v. Bd. of Trustees of Valley County Sch. Dist. Nos. 1 and 1A,* 563 F.Supp. 95, 98 (D.Mont.1983) ("The determinative inquiry here is whether the defendant school board is the 'alter ego' of the State . . . or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend."); *Mancuso v. N.Y. State Thruway Auth.,* 909 F.Supp. 133, 135 (S.D.N.Y.1995) ("NYSTA is not the State of New York. It is merely a public authority created pursuant to statute by the State Legislature.").

reasonable interpretation of the language of the statute. Further, the Supreme Court in *Moor* addressed this precise language as it applied to California counties. *See* discussion *supra* Part IV.D.2. In finding that counties exercise an independent status apart from the State, the Court stated that "[m]ost notably, under California law a county is given 'corporate powers' and is designated a 'body corporate and politic.'" 411 U.S. at 719, 93 S.Ct. 1785 (footnotes omitted). This analysis would tend to remove ambiguity as to the corporate status of a district.

Therefore, the court concludes that the district has a "sufficiently independent corporate character" to be viewed as an entity separate and apart from the State of California for purposes of Eleventh Amendment immunity. *See Edelman,* 415 U.S. at 668 n. 12, 94 S.Ct. 1347; *Moor,* 411 U.S. at 719–21, 93 S.Ct. 1785. Thus, this factor weighs against a finding of Eleventh Amendment immunity.

## IV.

### CONCLUSION

For the foregoing reasons, the court finds that all of the applicable factors weigh in favor of a finding that the Placer County Air Pollution Control District is not an "arm of the state" entitled to Eleventh Amendment immunity.[13] Accordingly, defendant's motion for reconsideration is DENIED.[14]

IT IS SO ORDERED.

---

13. Because defendant's argument in section B of its motion for summary judgment relies on PCAPCD's status as an arm of the state—an argument rejected by the court here—the court will not address that argument separately.

14. The court hereby vacates its December 23, 2002 Memorandum & Order.