Frank PARTNOY, an individual; Laura Adams, an individual; Peter Stris, an individual; Jason Wilson, an individual; and California Informed Voters Group, an unincorporated association, Plaintiffs,

v.

Kevin SHELLEY, in his official capacity as Secretary of State for the State of California; Sally McPherson, in her official capacity as the Registrar of Voters for the County of San Diego; and Conny McCormack, in her official capacity as the Registrar–Recorder/County Clerk for the County of Los Angeles, Defendants.

No. 03CV1460 BTM (JFS).

United States District Court, S.D. California.

July 29, 2003.

Opinion Granting Reconsideration in Part Aug. 21, 2003.

Shaun P. Martin, University of San Diego, School of Law, San Diego, CA, for plaintiffs.

Leslie R. Lopez, Office of the Attorney General, Sacramento, CA, Timothy M. Barry, County of San Diego Office of County Counsel, San Diego, CA, Judy W. Whitehurst, County of Los Angeles, Office of the County Counsel, Los Angeles, CA, for defendants.

## MEMORANDUM DECISION AND ORDER GRANTING MOTION ON THE PLEADINGS AND DECLARING CALIFORNIA ELECTIONS CODE § 11382 UNCONSTITUTIONAL

MOSKOWITZ, District Judge.

## I. INTRODUCTION

This case involves the recall election of California Governor Gray Davis which is currently set for October 7, 2003. By bringing this suit Plaintiffs are not, however, trying to halt or delay the recall election. Rather, Plaintiffs seek to have one discrete provision of the California Elections Code, involving how the votes are to be counted, declared unconstitutional. The challenged provision, section 11382 of the California Elections Code, states that "No vote cast in the recall election shall be counted for any candidate unless the voter also voted for or against the recall of the officer sought to be recalled." The question before the Court is whether this provision violates Plaintiffs' First and Fourteenth Amendment rights of free expression and their right to vote for the person who will govern them.

## II. BACKGROUND

On July 23, 2003, the California Secretary of State certified that a petition to recall Governor Gray Davis had obtained the requisite number of signatures to require a recall election ("the Davis Recall"). Consistent with California law, Lieutenant Governor Cruz Bustamante set an election date of October 7, 2003. On July 23, 2003, Plaintiffs filed the instant lawsuit seeking to enjoin the enforcement of California Elections Code § 11382 ("section 11382") and a declaration that section 11382 violates the United States Constitution. On July 24 and 25, 2003, the Court held several status conferences to coordinate the proceedings in this case. During these status conferences the parties made several representations, waivers, and stipulations in order to expedite the resolution of this case: (1) Defendants waived all objections to venue; (2) Defendants represented to the Court that they will not print, mail or distribute any ballots or instructions on the recall voting procedures until August 20, 2003, at the earliest;[1] (3) all parties agreed that the appropriate method for resolving this issue was on a motion for judgment on the pleadings and Defendants agreed to waive any objection to Plaintiffs filing such a motion prior to Defendants serving their answer; and (4) the parties agreed that because there were no disputes of fact and that this case involves purely a matter of law, if the Court were to order any sort of injunctive relief, it should be on a permanent, and not preliminary, basis.

The Court set an expedited briefing schedule so that this matter could be resolved by the district court and allow for appellate review. Los Angeles County and San Diego County contend that they must send the ballots to the printer no later than August 16, 2003, and August 20, 2003, respectively.

## III. DISCUSSION

The California recall procedure is set forth in the California Constitution and the California Elections Code. Article 2, section 14 of the California Constitution provides:

(a) Recall of a State officer is initiated by delivering to the Secretary of State a petition alleging reason for recall. Sufficiency of reason is not reviewable. Proponents have 160 days to file signed petitions.

(b) A petition to recall a statewide officer must be signed by electors equal in number to 12 percent of the last vote for the office, with signatures from each of 5 counties equal in number to 1 percent of the last vote for the office in the county.

Article 2, section 15 provides for the recall election:

(a) An election to determine whether to recall an officer and, if appropriate, to elect a successor shall be called by the Governor and held not less than 60 days nor more than 80 days from the date of certification of sufficient signatures.

. . . .

(c) If the majority vote on the question is to recall, the officer is removed and, if there is a candidate, the candidate who receives a plurality is the successor. The officer may not be a candidate, nor shall there be any candidacy for an office filled pursuant to subdivision (d) of Section 16 of Article VI.

---

1. Plaintiffs contend that Defendants are required by section 3103 of the California Elections Code to send out certain ballots 60 days before the election, which in this case would be on August 8, 2003. Defendants contend that they are not bound by this provision in a recall election and that, in any event, such a deadline is unworkable because the names of any successor candidates will not be certified until August 9, 2003. The applicability of section 3103 is not an issue in Plaintiffs' complaint.

Section 11320 of the Elections Code provides that the recall ballot shall have the following question: "Shall Gray Davis be recalled (removed) from the officer of Governor?" The voter shall mark "yes" or "no" to the right of the question. Section 11384 of the Elections Code provides that, "If a majority of the votes on a recall are 'Yes', the officer sought to be recalled shall be removed from office upon qualification of his successor." Section 11385 provides that "If at a recall election an officer is recalled, the candidate receiving the highest number of votes for the office shall be declared elected for the unexpired term of the recalled officer."

The provision in question here, section 11382, provides that, "No vote cast in the recall election shall be counted for any candidate unless the voter also voted for or against the recall of the officer sought to be recalled." Section 11382 is derived from the 1911 amendment to the California Constitution which provided that:

> [N]o vote cast shall be counted for any candidate for said office unless the voter also voted on said question of the recall of the person sought to be recalled from said office.

1911 Cal. Const., art. XXIII, § 1. The provision at issue here was removed from the California Constitution but enacted in its present form in section 11382.

Plaintiffs contend that section 11382 violates their rights under the United States Constitution because it requires them to vote either "yes" or "no" on the issue of whether Governor Davis should be recalled as a prerequisite for counting their votes on any successor candidates for Governor. Plaintiffs allege that while they fully intend and desire to vote on who will be the next Governor, should Governor Davis be recalled, they do not want to vote on the recall issue itself. Some of the Plaintiffs state that they are morally and/or political-

ly opposed to voting on the recall because "the recall is either an illegitimate political process in general, or especially in the Davis Recall," and believe that participating in the process by voting "yes" or "no" "either legitimates the process or is untenable as a matter of personal principle." Motion at 19. Other Plaintiffs state that they are "agnostic on the merits of the recall" and therefore prefer not to vote one way or the other on the issue.

Plaintiffs allege that section 11382 violates their Constitutional rights to due process and equal protection under the Fourteenth Amendment because if they do not vote on the recall issue, their votes on potential successors will not be counted. Plaintiffs contend that their rights under the First Amendment are also violated because they are being forced to speak on the recall decision despite their wishes not to do so. Additionally, Plaintiffs allege that this provision violates their right "not to vote" which is "implicitly recognized in the Ninth, Fourteenth, Fifteenth, Nineteenth, and Twenty–Sixth Amendments." Motion at 3.

It is clear to the Court, and not contested by Defendants, that the case is ripe for determination and that Plaintiffs have standing to challenge section 11382. Since the petition for the Davis Recall has been certified, an election date has been set, and the challenged election provision is still in effect, there is an actual "case or controversy." The named Plaintiffs are all registered voters, either in San Diego County or Los Angeles County and have stated both their intention to vote for any successor to the current Governor and their intention not to vote on the issue of the recall, or their opposition to being coerced into having to vote on the recall issue. This is sufficient to meet the standard for individual standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ California Informed Voters Group ("CIVG"), an unincorporated association, is also a plaintiff in this suit. An association has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). It is clear from an examination of the pleadings, and the fact that the individual plaintiffs have standing, that CIVG has standing to sue as well. *See Fair Housing in Huntington Committee, Inc. v. Town of Huntington*, 316 F.3d 357, 363 (2nd Cir.2003) (explaining that because "at least two of FHHC's members have standing ... thus, [FHHC] may bring suit in a representative capacity.").

A judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is properly granted "when, taking all allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir.1998) (citing *McGann v. Ernst & Young*, 102 F.3d 390, 392 (9th Cir.1996)). A motion for judgment on the pleadings brought pursuant to Rule 12(c) may be brought "[a]fter the pleadings are closed but within such time as not to delay the trial . . . ." Fed.R.Civ.P. 12(c).

■ In order to be granted a permanent injunction, a party must demonstrate (1) the likelihood of substantial and immediate irreparable injury, and (2) the inadequacy of remedies at law. *See G.C. and*

*K.B. Investments, Inc. v. Wilson*, 326 F.3d 1096, 1107 (9th Cir.2003).

■ While Plaintiffs base their challenges on 42 U.S.C. § 1983 and various Constitutional amendments, all these claims can be addressed under a single analytical framework.[2] *See LaRouche v. Fowler*, 152 F.3d 974, 987 (D.C.Cir.1998) ("[W]e have previously recognized that the case law relating to section 1983 claims, and that relating to claims brought directly under the Constitution, have been assimilated in most . . . respects.' "). Furthermore, the Supreme Court's recent election law cases direct that Constitutional challenges brought under the First and Fourteenth Amendments be addressed "using a single basic mode of analysis." *Id.* at 987–88 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 787 n. 7, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)) ("[W]e base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis."); *see also, Republican Party v. Faulkner County*, 49 F.3d 1289, 1293 n. 2 (8th Cir.1995) ("In election cases, equal protection challenges essentially constitute a branch of the associational rights tree.").

■ Although the Supreme Court has stated that Constitutional challenges to specific provisions of state elections laws "cannot be resolved by any 'litmus-paper test,'" the Court has identified the proper analytic framework for addressing these issues. As the Court stated in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983):

[A] court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magni-

---

**2.** The "state action" prong of the section 1983 analysis is clearly met here because Defendants are state officials who are sued only in their official capacities. Therefore, the only issue is whether Defendants' actions violate Plaintiffs' Constitutional rights.

tude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* at 789, 103 S.Ct. 1564.

■ The "rigorousness" of the inquiry, however, depends on "the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). The Court in *Burdick* outlined a two-tier approach to this issue:

> [W]hen those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.

*Id.* at 434, 112 S.Ct. 2059 (internal citations omitted).

■ Therefore, this Court must first determine the extent to which section 11382 burdens Plaintiffs' First and Fourteenth Amendment rights and whether such a burden is either "severe" or only a "reasonable nondiscriminatory restriction."

■ Plaintiffs are certainly correct that the "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Furthermore, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Implicit in the right to vote is the right to have that vote counted. *See Davis v. Bandemer,* 478 U.S. 109, 124, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) ("[E]veryone ha[s] the right to vote and to have his vote counted.").

This does not mean, however, that states cannot effect "substantial regulation" of their elections so that they may be "fair and honest" and to ensure that "some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). As a practical matter, states have "evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways ... the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Id.* In this case, Plaintiffs are not challenging any of these types of election regulations. In fact, it is uncontested that the individual Plaintiffs meet all the qualifications to be registered voters and fully intend to comply with the time and place requirements to vote in the Davis recall. Plaintiffs are only challenging the requirement that they must vote on one issue in order for their vote to be counted on another issue.[3]

---

**3.** The Court does not consider the procedure in section 11382 to be analogous to the suc-

Defendants, however, challenge Plaintiffs' basic assertion that the recall election presents two separate and distinct questions to be voted on. According to Defendants, "voters are asked to answer only one, albeit compound, question: should the incumbent be recalled and, if so, who should replace him or her." Kevin Shelley, Secretary of State of the State of California's Response to Plaintiffs' Motion for Judgment on the Pleadings ("Shelley Response") at 4. At the heart of this argument is the contention that the recall and the successor election are in fact the same process. As Defendants state in their response:

> When an official is recalled, his or her successor is elected by a plurality vote from among a group of successor candidates appearing on the same ballot. This eliminates the need for a subsequent special election. And even though the recalled official cannot appear as a candidate to be his or her own successor, he or she is a 'candidate' for their office, and a vote against the recall is a vote for the incumbent. Thus, by facing a vote on the issue of the recall Governor Davis is, in essence, a candidate for Governor on the recall ballot.

*Id.* at 3, n. 8. The Court finds this argument without merit because an incumbent who wins 49% of the "no" vote can still be replaced by a candidate who receives a mere 34% plurality of the votes in a three-way race for a successor or 26% of the vote in a four-way race. Therefore, it cannot be contended that the incumbent is, in effect, on the same ballot as the potential successors.

Defendants also proffer two analogies in support of their position that no unconstitutional pre-qualification exists in this case. First, they contend that the recall

process is similar to "voters' consideration and approval or rejection of proposed bond acts." *Id.* While it is true that such proposals are often multi-faceted as to the projects the bond will authorize, and voters do not have a choice to limit which projects the bond may support, Defendants have provided no evidence that such bonds, or any other ballot propositions, allow for or require two or more separate votes. In the case of a bond it is certainly reasonable for a state to inform the electorate as to which project or projects the allocated money will fund. In this case, the voters are not told who will be the new governor should they vote to recall the incumbent. Rather, voters are given a choice of candidates to select from if the recall passes. Therefore, the Court does not find the bond analogy to be apposite.

Defendants' second analogy is to a presidential election where "a voter—speaking with one vote—makes a choice for both the President and Vice President." Shelley Response at 4, n. 9. The Court finds this analogy equally inapposite. In a presidential election, votes are cast for electors, not directly for the candidates. Members of the electoral college are bound to vote for the candidates of their party. While it is clear that this procedure passes Constitutional muster, it is sufficiently distinguishable from the recall process at issue in this case. *See* U.S. Const., art. II, § 1, cl. 2; *Ray v. Blair,* 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894 (1952).

Defendants argue that even if the Court construes the recall process to include two separate questions, the requirement that a person vote on both questions "imposes only a minimal burden on voters." Shelley Response at 7. Defendants contend that

---

cessive ballots a person may be required to cast in a primary and a general election or to an attempt by a state to fairly and efficiently

channel and limit the generalized expressive functions the voting process itself serves.

because "a recall election is a drastic form of 'impeachment by the voters,' California can impose the minimal burden of requiring a voter who chooses to participate in the recall process to participate in deciding whether [the elected] official should be removed from office in order to participate in deciding on the officer's successor." *Id.* To the extent this argument simply repeats Defendants' contention that the recall presents only one question and that requiring a voter to check two boxes to answer it is only a minimal burden, the Court has already addressed and rejected this proposition. To the extent that Defendants seek to justify the requirement that a person vote on both questions, i.e., because it is a "drastic form of impeachment," the Court considers this argument more properly analyzed as one of the State's justifications for the burden on a voter's rights, not as indicative of the weight of that burden. Accordingly, the Court finds that this argument does not justify the determination that section 11382 imposes "only a reasonable, nondiscriminatory restriction[ ] upon the First and Fourteenth Amendment rights" of California voters. *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059.

The Court also finds Defendants' reliance on the actual holding of *Burdick* to be unavailing. In *Burdick,* the Supreme Court held that Hawaii's prohibition on write-in voting did not unreasonably infringe upon its citizens' rights under the First and Fourteenth Amendments because it was a reasonable regulation of the election process. However, the Court also stated that while it is not the function of the election process to "provide a means of giving vent to short-range political goals, pique, or personal quarrels," the "[r]easonable regulation of elections *does not* require voters to espouse positions that they do not support ...." 504 U.S. at 438, 112 S.Ct. 2059 (discussing reasons for finding state law banning write-in candidates not

to be a severe burden on plaintiff's right to vote) (internal citations omitted). In *Burdick,* the Court construed the burden on voting rights to be an issue of timely access to the ballot and found that because Hawaii's electoral system provided "easy access to the ballot ... any burden on voters' freedom of choice and association is borne only by those who fail to identify their candidate of choice until days before the primary." 504 U.S. at 436–37, 112 S.Ct. 2059. This is not the case here. Plaintiffs are not seeking to have any particular candidate put on the ballot. Nor is this an issue of timing. Plaintiffs' rights will be affected to the same degree regardless of when Plaintiffs seek to assert them. Plaintiffs in this case want to vote on one of the issues that is actually presented on the ballot. They simply do not want to be forced to vote on a different issue in order for that vote to be counted.

■ Because section 11382 will effectively bar Plaintiffs from having their otherwise valid vote for a gubernatorial successor counted, or compel them to vote on a separate issue upon which they do not wish to vote, the Court determines that section 11382 effects a severe restriction on their Constitutional right to vote. *Id.* at 434, 112 S.Ct. 2059. Indeed, if Plaintiffs decline to vote on the question of recall as a protest of the recall process, they are denied the right to have their vote counted on the question of who shall govern them. In order to have a condition precedent to the exercise of the right to vote for who will be one's Governor, California must advance evidence it is "narrowly drawn to advance a state interest of compelling importance." *Id.*

■ Defendants contend that the recall election is a special interest election where the State need only show an important regulatory interest rather than a compelling interest. However "special" and his-

toric the present recall election is, it is not a special interest election as that term is used by the Supreme Court. In *Hill v. Stone*, 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975), the Supreme Court noted that a special interest election could limit voters to those sharing that special interest. But the Court construed special interest election as those limited circumstances such as a water district where the disproportionate effect of the governing body's activities was on specific landowners as a group. 421 U.S. at 295 n. 5, 95 S.Ct. 1637. The selection of a governor is not an interest special only to those favoring recall. Rather, it is of paramount interest to all of California's voters. As the Supreme Court in *Hill v. Stone* held, in a general interest election, "restriction on the franchise other than residence, age, and citizenship must promote a compelling state interest in order to survive constitutional attack." 421 U.S. at 289, 95 S.Ct. 1637.

■ In offering a sufficiently compelling state interest to justify the restriction imposed by section 11382, Defendants proffer several reasons. First, Defendants argue that "[a]ssuring that an elected official is not removed from office unless a majority of those voters who choose to participate in the recall process vote for his or her removal furthers the important state interest of fostering an effectively functioning government and guarding against disruption in state government." Shelley Response at 8. Defendants explain that "[r]emoving an elected official and replacing him or her without the certainty that a majority of those voters who chose to participate in the recall process actually voted to recall the officer, could lead to chaos and disruption in the functioning of state government." *Id.*

While Defendants are correct in their assertion that a state has a permissible and compelling interest in "the stability of its political system," *Storer v. Brown*, 415 U.S. 724, 736, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), they have not adequately demonstrated that chaos will result without section 11382 or how section 11382 will stem the flow of any such "chaos and disruption." Regardless of the applicability or non-applicability of section 11382, whether or not Governor Davis is recalled will be decided by a majority of those who vote on that issue. Likewise, if Governor Davis is in fact recalled, his successor will be chosen by a plurality of those who vote on that issue regardless of whether section 11382 is in effect or not.

Indeed, under section 11382, one can vote on the recall but not on the election of a successor. This possibility seems to create the same concern that Defendants argue section 11382 was designed to prevent. Modern vote counting procedures will provide a tally of the "yes" and "no" votes and the votes for the several potential successors. It is hard to imagine any chaos that will truly result.

It is possible that Defendants are really arguing that unless a great number of people vote on the recall issue, then the successor election will appear to be illegitimate and, as such, will have a destabilizing effect on the running of the State government. To the extent section 11382 remains in force, however, it actually undermines this argument because it will likely discourage those voters who, like Plaintiffs, would otherwise vote for a successor. To the extent the state is using access to voting for a successor as a carrot to entice people to legitimize the recall process or a stick to punish those who do not, such a rationale is unjustified. As the Supreme Court stated in *Burdick*, it is not a reasonable regulation of elections for a state to "require voters to espouse positions that they do not support." 504 U.S. at 438, 112 S.Ct. 2059.

█ Defendants also argue that the State has an important governmental interest in ensuring that only those voters with a "direct" interest in the successor election are allowed to vote and an interest in making certain that those votes are not diluted. The Court finds these arguments unpersuasive. Simply because a person is either opposed to the recall election process or agnostic to its merits, does not mean that that person is not directly interested in who will be their next Governor. Defendants' supporting argument, that without section 11382 the public will never know whether an elected successor was validly recalled by a majority of those who participated in the recall process, is not in fact true. As noted above, the tally on both recall and successor will be clear and apparent.

█ Defendants argue that section 11382 furthers the important interest of the State in protecting the integrity and continuity of validly elected officials. They argue that "[s]ection 11382 also protects the peoples' interest in seeing their elected officials remain in office unless the voters show a substantial interest in whether the official is removed or not." Shelley Response at 8. However, section 11382 actually does not serve this purpose and has the opposite effect.

First, there is no requirement as to the number of voters who must vote on the recall. While twelve percent of those who cast their vote in the preceding gubernatorial election must sign a recall petition, Cal. Const., art. II, § 14(b), there is no requirement that any number of voters actually cast a recall vote. Thus, if only one percent of voters who voted in the last gubernatorial election vote in the recall, the recall could be decided by as little as slightly more than one-half of one percent of the votes cast in the regular election. Neither section 11382 nor the recall provisions mandate a recall only when the vote

demonstrates that the "voters show a substantial interest in whether the official is removed or not."

Second, section 11382 has the effect of reducing the vote on who shall lead the State as Governor as it disallows votes by otherwise properly registered voters. Thus, section 11382 allows the present Governor to be removed by a smaller vote than by which he or she was elected and the successor governor elected by even less votes. Section 11382 actually would discourage persons who wish to abstain from voting in the recall from participating in the overall recall process entirely.

█ Defendants also argue that without section 11382 persons who only have "an indirect or remote interest" in the recall will decide who will replace a recalled officer. Shelley Response at 9. However, it must be underscored that voters are not merely voting on who will be replacing a recalled officer, they are voting on who will be their Governor-that is, who will govern the people of California. All of the registered voters of California have a separate and paramount interest in that decision.

Finally, Defendants argue that if the Court strikes down section 11382 as unconstitutional, this may create a situation where uncertainty arises in the interpretation of another section of the statute, namely California Elections Code section 11383. Section 11383 states: "If one-half or more of the votes at a recall *election* are 'No', the officer sought to be recalled shall continue in office." (emphasis added). In contrast, section 11384 states: "If a majority of the votes on a recall *proposal* are 'Yes', the officer sought to be recalled shall be removed from office upon the qualification of his successor." (emphasis added). Defendants contend that because section 11384 uses the words "recall proposal", whereas section 11383 uses the words "recall election", it is possible that an ambigu-

ous situation could arise "if the number of 'No' votes cast on the *recall proposal* exceed the number of 'Yes' votes but do not total 'one-half or more' of the total votes cast in the *recall election*." Sally McPherson, Registrar of Voters for the County of San Diego's Joinder in Opposition to Plaintiffs' Motion at 3.

It is clear to the Court that the words "recall election" in section 11383 and "recall proposal" in section 11384 are synonymous and refer solely to the question of whether or not the incumbent official shall be recalled. Both sections 11383 and 11384 refer to the vote tally of "yes" or "no" votes and not to the votes cast for successors. *See Wells v. Marina City Properties, Inc.*, 29 Cal.3d 781, 176 Cal. Rptr. 104, 632 P.2d 217 (1981) (a construction which makes sense of an apparent inconsistency is to be preferred to one which renders statutory language useless or meaningless); *Hough v. McCarthy*, 54 Cal.2d 273, 5 Cal.Rptr. 668, 353 P.2d 276 (1960) (a court must, where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them and construe them to give force and effect to all their provisions); *Kydd v. City and County of San Francisco*, 37 Cal.App. 598, 174 P. 88 (1918) (statutes must be so construed that the whole, if possible, may stand).

The Court holds that section 11382 substantially burdens the right of citizens of California to vote on a successor governor in the event of a recall by conditioning the counting of that vote on whether the voter cast a ballot on the question of recall. The Court finds that the precise interests put forward by the State as justifications for the burden imposed by section 11382 neither advance a state interest of compelling importance nor even an important regulatory interest of the State. *Burdick* at 434, 112 S.Ct. 2059 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)).

Section 11382, however, does more than unconstitutionally burden Plaintiffs' right to vote. It forces them to take a position on the question of recall, of which the failure to do so results in the cancellation of their vote of who should be their governor. Such an effect violates Plaintiffs' First Amendment Right of free expression. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) ("The right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all .... The right to speak and the right to refrain fro speaking are complementary components."); *Pacific Gas & Elec. Co. v. Public Utilities Comm'n*, 475 U.S. 1, 16, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) ("[T]he choice to speak includes within it the choice of what not to say.").

The parties have not cited nor has the Court found any case directly on point. While this is a case of first impression, the words of the Court of Appeals for the First Circuit in *Ayers—Schaffner v. DiStefano*, 37 F.3d 726 (1st Cir.1994) seem apropos. There a school board election was invalidated and only those who voted in the original balloting were permitted to vote in the re-election. The Court declared this restriction unconstitutional saying:

> The right to vote "is of the most fundamental significance under our constitutional structure" ... and depriving a qualified voter of the right to cast a ballot because of failure to vote in an earlier election is almost inconceivable.

37 F.3d at 727 (internal citations omitted).

Here too, what is at stake is the right of a voter to decide who shall succeed the Governor, if recalled. Every voter, whether they voted for or against that recall has a paramount interest in choosing the person who will govern them. Whatever rea-

sons for section 11382 existed in 1911, they fail to pass Constitutional muster ninety-two years later.

## IV. CONCLUSION

Plaintiffs' motion for judgment on the pleadings is GRANTED. The Court holds that California Elections Code section 11382 is unconstitutional. Furthermore, the Court finds that Plaintiffs have made the requisite showing for a permanent injunction, namely that they have demonstrated (1) the likelihood of substantial and immediate irreparable injury, and (2) the inadequacy of remedies at law. *See G.C. and K.B. Investments, Inc. v. Wilson,* 326 F.3d 1096, 1107 (9th Cir.2003). Defendants, as well as any individual, agency, or entity acting on their behalf or pursuant to their authority, or any other individual, agency or entity with actual notice of this order, are permanently enjoined from (a) enforcing in any manner and in any recall election conducted in the State of California the provisions of California Elections Code section 11382, (b) preparing, approving, or disseminating to any individual, agency or entity any ballots, sample ballots, voter instruction materials, or other documents that state, in sum or substance, that a voter must cast a vote on the recall for their vote for any successor candidate to be counted, or otherwise attempt to persuade or inform voters that their vote on a successor candidate will not be counted unless they also cast a vote for or against the recall; and (c) failing to count any otherwise valid ballot or vote based on the fact that the voter did not vote either "yes" or "no" on the question of recalling the Governor.

Finally, the Court holds that the words "recall election" in California Elections Code section 11383 refer only to the "yes" or "no" vote for or against recalling the incumbent official.

**IT IS SO ORDERED.**

## ORDER GRANTING IN PART AND DENYING IN PART JUDGMENT ON THE PLEADINGS

## I. INTRODUCTION

The Court entered a final judgment in this case on July 29, 2003. On August 1, 2003, Scott Rafferty ("Rafferty") faxed a letter directly to chambers purporting to seek to intervene. He was directed to file a proper motion to intervene by August 6, 2003, which he did. The Court granted his motion to intervene on August 14, 2003. Rafferty filed his Complaint In Intervention on August 15, 2003. The Court *sua sponte* set this matter for expeditious resolution on cross-motions for judgment on the pleadings. Plaintiffs filed a motion to dismiss the complaint in intervention ("Pl. Mot."), Rafferty filed a motion for judgment on the pleadings ("Rafferty JMP") and Defendant Shelley, Secretary of State, filed an opposition to Rafferty's motion for judgment on the pleadings ("Shelley Op."). The Court held a hearing on the matter on August 20, 2003.

The Court finds there is no dispute of fact at issue in this case. The Court *sua sponte* set the matter for cross-motions for judgment on the pleadings. *See Sitarek v. Shalala,* 1994 WL 175116, * 1 (W.D.N.Y.) (approving simultaneous filing of cross-motions and answers); The Court placed all parties on notice that it was entertaining the entry of a final judgment on the papers filed pursuant to its scheduling order.

## II. DISCUSSION

Mr. Rafferty contends that once the Court made the determination that California Elections Code Section 11382 was unconstitutional, it should not have proceeded to construe the term "election" in Section 11383 to mean "proposal." (7/29/03 Mem. Order at 13–14.) Rafferty

contends that Section 11382 is an integral part and not severable from other provisions of the recall system because Sections 11381(c), 11382, and 11384 were part of a "legislative compromise" in which the current official was prevented from running to succeed himself because Section 11382 "ensured that every voter eligible to vote for successors had already voted for (or against) the incumbent in the same recall proposal. Section 11382, working in conjunction with §§ 11383 and 11384, ensured that an officer would not be removed from office unless a majority of all persons voting on his successor also voted to recall him, since it guaranteed that no person who had not voted for (or against) his recall would vote for a successor." Complaint at ¶ 13.

Because the Court's decision ostensibly strikes down one part of this legislative compromise, but not the other, he seeks to have the Court either (1) not enjoin the Secretary of State from applying Section 11382 to the current election and, instead, allow the state legislature to devise a constitutionally appropriate replacement "compromise"; or (2) enjoin the entire recall election.

### A. *RULE 59(e)*

■ Both Plaintiffs and Defendants contend that Rafferty's Complaint is "jurisdictionally time-barred from altering the existing Final Judgment" by Rule 59(e) of the Federal Rules of Civil Procedure.[1] (Pl. Mot. at 13; Shelley Op. at 2.) Furthermore, Plaintiffs claim that because Rafferty was not a party to this action on August 6, 2003, his Motion for Leave to Intervene cannot qualify as a Rule 59(e) motion. (Pl. Mot. at 14); *See In Re NASDAQ Market–Makers Antitrust Litigation*, 184 F.R.D. 506, 511 (S.D.N.Y.1999) (Rule 59(e) motions can only be brought by parties; possible intervenors are not deemed parties permitted to bring motion). The Court finds neither of these arguments persuasive.

Although Rafferty delayed in filing his motion to intervene, the Court nonetheless allowed him to intervene in large part.[2] While there is case law supporting the proposition that a party can intervene for the purposes of filing an appeal after the ten-day period for a Rule 59(e) motion, *see Romasanta v. United Airlines*, 537 F.2d 915, 919 (7th Cir.1976), in this case the Court did not allow Rafferty to intervene for purposes of appeal of the determination of the constitutionality of Section 11382 because in that respect his motion to intervene was both untimely and highly prejudicial.[3] The Court did grant Rafferty

1. Under Rule 59, "[a]ny motion to alter or amend a judgment shall be filed no later than 10 days after the entry of the judgment." Fed.R.Civ.P. 59(e).

2. As the Court explained in its status conference on August 14, 2003: "I am not allowing you to intervene to take an appeal, because what you will have done, you will have disrupted this schedule to allow for orderly processing of this before the printing of the ballots. You will have entered it late in such a way ... as to cause immense prejudice to the state and the county election boards, because they have to print the ballots.... [B]ut if you had entered it at a time earlier, then there would have been the opportunity for appellate

review. You could have intervened, and then you could have appealed and there would have been time for appellate review, but you didn't do that." 8/14/03 Tr. at 23: 9–21. The Court also noted that in addition to failing to file a proper motion to intervene, Rafferty did not comply with Civil Local Rule 5.3 as to the proper manner to fax file documents with the Clerk. It also appears that there is no proof of service for his August 1, 2003 letter.

3. When questioned by the Court as to why it took him three days to first contact the Court—from the July 29th decision to his August 1st letter—and over a week to file a proper motion to intervene, Rafferty first stated: "I sent a single-spaced document to the

leave to file a complaint in intervention attacking the injunctive relief granted in the July 29, 2003 order. The parties contend that Rafferty is out of time because he can only seek relief under Fed.R.Civ.P. 59(e) by a motion filed within 10 days of the entry of the order.

The Court concludes that Rafferty's request to reconsider the injunctive relief is not untimely. First, by filing his motion to intervene on August 6, 2003, he was in essence simultaneously moving for reconsideration and was within the 10–day period. To contend that his request for reconsideration was untimely because intervention had not been granted until August 14, 2003, would effectively bar persons wishing to intervene and seek reconsideration from timely doing so. The motion to intervene was effectively a motion for intervention and reconsideration. Secondly, even if his request for relief under Rule 59(e) was untimely, relief is still appropriate under Fed. R.Civ.P. 60(b)(6) (relief from judgment for "any other reason justifying relief from operation of the judgment."). *See Beentjes v. Placer County Air Pollution Control Dist.*, 254 F.Supp.2d 1159, 1161 (E.D.Cal.2003) (A "court may construe an untimely motion for reconsideration brought under Rule 59(e) as a motion based on Rule 60(b).") (citation omitted); *Spacey v. Burgar*, 207 F.Supp.2d 1037, 1048 (E.D.Cal.2001) ("Rule 60(b)(6) serves as the catch-all provision, conferring on the court broad discretion to relieve a party from final judgment upon such terms as are just.") (citations and internal quotations omitted). Therefore, the Court finds Rafferty's request for reconsideration by intervention not to be untimely.

### B. *SEVERABILITY*

██ Because Rafferty's complaint in intervention is premised on Section 11382's non-severability, the Court must examine its prior implicit determination that this section was severable. As the Supreme Court stated, "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Brockett v. Spokane Arcades*, 472 U.S. 491, 506 n. 15, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) (citation omitted).

██ A federal court is empowered to determine whether an unconstitutional provision of a state statute can be severed. *See Brockett*, 472 U.S. at 506 (discussing a lower federal court's ruling on the constitutionality of a Washington state statute). In doing so, federal courts apply state law. *See Leavitt v. Jane L.*, 518 U.S. 137, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996); *Valley Outdoor, Inc. v. County of Riverside*, No. 02–55475, slip op. 8539, 8540 (9th Cir. Aug. 1, 2003). "The California Supreme Court has held that there are three criteria for severability under California law: the provision must be grammatically, functionally, and volitionally separable." *Id.* at 8540 (citing *Calfarm Ins. Co. v. Deukmejian*, 48 Cal.3d 805, 821, 258 Cal.Rptr. 161, 771 P.2d 1247 (1989)). As the California Supreme Court has stated, "[a]lthough not conclusive, a severability clause normally calls for sustaining the valid part of the

---

Court within hours of discovering [sic] of the decision and it was styled Motion to Intervene. I realize it did not comply with the local rules, which frankly, I did not have so much as an opportunity to consult. I tried to get this in front of you as quickly as possible."

8/14/03 Tr. at 24:11–17. Upon further questioning, however, Rafferty admitted: "Okay, it was in the newspapers on the 30th. I saw it on the 30th. It was referred to in a brief that we filed late that afternoon." *Id.* at 26:6–8.

enactment, especially when the invalid part is mechanically severable." *Gerken v. Fair Political Practices Comm.,* 6 Cal.4th 707, 714, 25 Cal.Rptr.2d 449, 863 P.2d 694 (1993) (internal citation and quotation marks omitted); *see, also, In re Blaney,* 30 Cal.2d 643, 655, 184 P.2d 892 (1947) ("In considering the issue of severability, it must be recognized that the general presumption of constitutionality, fortified by the express statement of a severability clause, normally calls for sustaining any valid portion of a statute unconstitutional in part.").

The California Elections Code does contain a severability clause, thus giving rise to a legislative presumption in favor of survival of the remaining valid recall provisions. California Elections Code, Section 3 provides that, "[i]f any provision of this code or the application thereof to any person or circumstance is held invalid, the remainder of the code and the application of that provision to other persons or circumstances shall not be affected thereby."

### 1. *Grammatically Separable*

█ Under the first step of California's severability test, it is clear that Section 11382 is mechanically and grammatically separable from the rest of the statute. The Court did not excise a single word or a phrase from any sentence. Nor did it remove one sentence from a paragraph. Rather, the Court struck down the entirety of one of many separately numbered sections of the recall chapter. None of the parties contend that Section 11382 is not grammatically separable.

### 2. *Functionally Separable*

█ Second, the Court finds that the constitutionally invalid section is functionally separable from the other recall provisions. Section 11382 prevents the counting of votes for a successor unless that voter also cast a vote on the recall question itself. No other recall provisions explicitly

deal with this same proposition. In particular there is no mention of how the votes on the recall or selection of a successor will be counted in Section 11381.

Rafferty contends that if Section 11382 is eliminated, Sections 11383 and 11384 will lose their meaning. These sections provide:

§ 11383. If one-half or more of the votes at a recall election are "No", the officer sought to be recalled shall continue in office.

§ 11384. If a majority of the votes on a recall proposal are "Yes", the officer sought to be recalled shall be removed from office upon the qualification of his successor.

Rafferty focuses on the use of the term "recall election" in Section 11383 and "recall proposal" in Section 11384. He contends that if Section 11382 is removed, confusion arises as to how the recall election is determined. He contends that since Section 11382 required all voters on the successor candidate to first vote on the issue of recall, the number of votes on the "recall election" and on the "recall proposal" would be the same. With the elimination of Section 11382, a different number of votes can be cast on the issue of recall and the issue of a successor. Rafferty contends that the officer, here the governor, can be removed only if a majority of the total ballots cast at the October 7, 2003 recall election (whether they be on the recall proposal only, the successor only, or both) are yes on the question of recall. The Secretary of State, however, contends that the governor is removed if a majority of the votes cast on the single "yes-no" question of whether the governor should be recalled is "yes." However, the Court need not determine how the majority is determined as long as it can be determined without Section 11382.

Unlike a state court, a federal court cannot explicitly "reform" a state statute. *See Tucker v. State of Calif., Dept. of Education,* 97 F.3d 1204, 1217 (9th Cir.1996) (stating that it is "not within the province of [a federal] court to 're-write' [a state law] to cure its *substantial constitutional infirmities.*") (emphasis added); *see also, Kopp v. Fair Political Practices Commission,* 11 Cal.4th 607, 47 Cal. Rptr.2d 108, 905 P.2d 1248 (1995) (exhaustively discussing the various means for reforming an otherwise unconstitutional statute). A federal court can, however, employ a range of interpretive tools to permissibly interpret or construe a state statute.[4] *See, e.g., Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (a federal court can apply a narrowing construction on a state statute if the language is "easily susceptible of a narrowing construction."); *3570 East Foothill Blvd., Inc. v. City of Pasadena,* 912 F.Supp. 1268, 1281 (C.D.Cal.1996) ("As a general rule, a court is bound to construe a statute to avoid absurd results and favor public convenience.") (internal citation omitted); *Legislature of the State of California v. Eu,* 54 Cal.3d 492, 534, 286 Cal.Rptr. 283, 816 P.2d 1309 (1991) (construing resulting language so that the invalid provision can be grammatically severed without affecting the operation of the remaining clauses).

In its earlier order, this Court construed the term "recall election" in Section 11383 to mean the same thing as the term "recall proposal" so that Section 11383 would effectively read "If one-half or more of the votes [on the recall proposal] are 'No', the officer sought to be recalled shall continue in office." Therefore, the Court interpreted Sections 11383 and 11384 as effectively

working as reciprocal measures. *See* Section 11384 ("if a majority of the votes on the recall proposal are 'Yes', the officer sought to be recalled shall be removed from office upon the qualification of his successor."). An examination of the California Constitution and the legislative history of these sections strongly supports this interpretation.

The recall procedure was originally added to the California Constitution in 1911 and provided that: "If a majority of those voting on *said question of the recall* of any incumbent from office shall vote 'No,' said incumbent shall continue in said office. If a majority shall vote 'Yes,' said incumbent shall thereupon be deemed removed from such office, upon the qualification of his successor." Cal. Const., former art. XXIII, § 1, par. 6 (emphasis added). The statutory embodiments of this provision set forth the same sort of mechanism for deciding how the votes in the recall would be counted. *See* Cal. Pol.Code § 4021a, added by Stats.1911, c. 342 p. 581 ("if the majority of those voting on said question of the recall of any incumbent shall vote 'No,' said incumbent shall continue in said office. If a majority shall vote 'Yes,' said incumbent shall thereupon be deemed removed from such office, upon the qualification of his successor."); Cal. Elec.Code § 11065, added by Stats.1939, c. 26, p. 301 ("If a majority or exactly half of those voting on the question of the recall of any incumbent from office vote 'No,' the incumbent shall continue in office. If a majority vote 'Yes,' the incumbent shall be deemed recalled from office, upon the qualification of his successor."); Cal. Elec. Code § 27007, added by Stats.1974, c. 233, p. 439 ("If a majority of those voting on

4. *See California Prolife Council Political Action Committee v. Scully,* 989 F.Supp. 1282, 1290–91 (E.D.Cal.1998) (stating that it is unnecessary to determine whether federal or state rules of construction apply under federal question jurisdiction because the "general rules of statutory construction are apparently identical under federal and California law.").

said question of the recall of any incumbent from office shall vote 'No', said incumbent shall continue in said office. If a majority shall vote 'Yes,' said incumbent shall thereupon be deemed removed from said office, upon the qualification of his successor."). It was not until the Elections Code revision of 1976 that this binary mechanism for counting the votes was split into separate sections and the words "recall election" used in one and "recall proposal" used in the other. *See* Cal. Elec. Code § 27343, added by Stats.1976, c. 1437, p. 6451 ("If one-half or more of the votes at a recall election are 'No', the officer sought to be recalled shall continue in office."); Cal. Elec.Code § 27344, added by Stats.1976, c. 1437, p. 6451 ("if a majority of the votes on a recall proposal are 'Yes' the officer sought to be recalled shall be removed from office upon the qualification of his successor.").

None of the parties have provided the Court with an authoritative explanation for this change much less any legislative history that would illuminate such an alteration in this heretofore consistent phraseology. The Report of the Joint Committee for the Revision of the Elections Code (which was incorporated into the Legislative Counsel's Report to the Governor on Assembly Bill No. 3467, which enacted these revisions) made no mention of these two provisions, nor did it provide an explanation for these changes.

Finally, the Court views the current California Constitution as being highly instructive as to the meaning of these terms. Article 2, Section 15 of the Constitution states that: "If the majority vote on the question is to recall, the officer is removed and, if there is a candidate, the candidate who receives a plurality is the successor." West's Ann. Cal. Const. Art. II, § 15 (2002).

▮ Based on a clear and commonsense reading of the language of Sections 11383 and 11384, the legislative history, and the current California Constitution, the Court finds that the words "recall election" in Section 11383 and "recall proposal" in Section 11384 are meant to be the same thing. While there is a difference of opinion as to whether the officer is recalled only if the yes votes constitute a majority of all the ballots cast on both the recall question and election of the successor or just the recall question, that difference does not affect severability.

In the Court's July 29, 2003 decision, the Court construed both Section 11383 and Section 11384 to refer to the number of yes or no votes cast on the question of whether the officer should be removed. The Court vacates that interpretation and holding (Memorandum Decision at page 14 lines 1–10 and page 16 lines 1–3) for two reasons. First, it is unnecessary to resolve this construction issue in determining whether Section 11382 can be severed from the remaining recall provisions, as votes for a successor will be counted even if the voter did not vote either "yes" or "no." The same rule of determining the outcome of the recall applies whether or not the voter did or did not vote "yes" or "no." Thus, the question of how to determine the result, that is, whether the proper denominator is the total ballots on the recall, successor or both, does not depend on whether Section 11382 remains effective.

Second, the California Courts, not this Court, should resolve the question of whether Sections 11383 and 11384 and California Const. Art. II, § 15 refer to the majority of votes cast on the sole question of whether the officer should be recalled or the majority of the combined number of ballots cast solely on recall, plus those cast solely on successor, plus those cast on both issues. Since the outcome of the issue of severability does not depend on that ques-

tion, this Court should not make that constructional determination. The Court's previous holding construing the meaning of Sections 11383 and 11384 is therefore vacated as unnecessary to a decision in this case.

### 3. *Volitionally Separable*

▮▮▮▮ Finally, the Court finds that Section 11382 is volitionally separable. The test of volitional separability is whether it is "reasonable to suppose that those who favored the proposition would be happy to achieve at least some substantial portion of their purpose." *Gerken v. Fair Political Practices Com.*, 6 Cal.4th 707, 715, 25 Cal.Rptr.2d 449, 863 P.2d 694 (quoting *Santa Barbara Sch. Dist. v. Superior Court*, 13 Cal.3d 315, 331, 118 Cal. Rptr. 637, 530 P.2d 605 (1975)). Rafferty provides a spirited account of how backroom deals in the 1911 California Legislature might have resulted in a legislative compromise from which Section 11382 can not be severed. (Rafferty MJP at 4–7.)

According to Rafferty, the state legislature struck a deal whereby the number of signatures required to institute a recall election would be reduced "provided that the incumbent would not be removed without a clear, affirmative majority" of those voting on the recall question. (Rafferty MJP at 5.) On this basis, the legislators replaced "a conventional, one-part election with a two-part question—the 'yes/no' vote followed by the election of a successor by plurality. As part of this package, the incumbent lost his right to run to succeed himself." (*Id.*) Rafferty contends that the inability of the officer to run to succeed himself is inextricably tied to the requirement that a voter vote on recall before he or she can vote on a successor.

Rafferty cites to Franklin Hichborn's *Story of the Session of the California Legislature of 1911* (1911) for support for his historical analysis.[5] However, it is unclear from Hichborn's account whether the requirement that one vote on recall before the vote counted as to a successor was inextricably tied to the provision that a recalled officer could not replace himself. Furthermore, there is no evidence that the legislators would not have proposed the balance of the recall provisions without the Section 11382 requirement.

▮▮▮▮ Even if there were sufficient evidence of the legislature's intent in 1911, a question which the Court need not reach,[6] Rafferty's analytical lens is focused on the wrong subject because this provision had to be approved by the voters not the legislature. As the California Supreme Court stated in *Delaney v. Superior Court*, 50 Cal.3d 785, 798, 268 Cal.Rptr. 753, 789 P.2d 934 (1990), "In the case of a constitutional provision adopted by the voters, their intent governs." *See also Jahr v. Casebeer*, 70 Cal.App.4th 1250, 1254, 83 Cal.Rptr.2d 172 (1999) (stating the same). In this case it is clear that in passing the

---

**5.** The California Supreme Court has found the views of Hichborn, an observer of the 1911 legislative session "to be particularly illuminating." *Rossi v. Brown*, 9 Cal.4th 688, 700 n. 7, 38 Cal.Rptr.2d 363, 889 P.2d 557 (1995).

**6.** The Court does note, however, that such statements of individual legislators, while they might be "illuminating," are not dispositive. *See Quintano v. Mercury Casualty Company*, 11 Cal.4th 1049, 1062, 48 Cal.Rptr.2d 1, 906 P.2d 1057 (1995) (the statements of an individual legislator, including the author of a bill, are generally not considered in construing a statute, as the court's task is to ascertain the intent of the legislature as a whole in adopting a piece of legislation); *In re Marriage of Bouquet*, 16 Cal.3d 583, 589–90, 128 Cal.Rptr. 427, 546 P.2d 1371 ("[I]n construing a statute we do not consider the motives or understandings of individual legislators who cast their votes in favor of it. [ ][N]o guarantee can issue that those who supported his proposal shared his view of its compass.").

recall provisions to the California Constitution, the voters wanted to effect a mechanism for removing state officials before the expiration of their terms of office. There is no evidence before the Court that the voters were aware of the allegedly interlinking "legislative compromise" described by Rafferty, nor is there anything apparent in the plain text of the language adopted that would have signaled such.[7]

Finally, and conclusively, in the view of this Court, California's voters approved constitutional amendments to the recall process in 1974 that effectively retained crucial aspects of the recall process in the Constitution and moved others, of lesser significance, into statutes. *See* Ballot Pamph., Gen. Elec. (Nov. 5, 1974) Proposition 9, at pp. 32–35, 86–87 (stating that the proposition removes procedural or technical details from the Constitution).[8] As part of this amendment, the constitutional language requiring voters to vote on the question of the recall in order for their vote on a successor to count was deleted from the Constitution and moved to the Elections Code (presently Section 11382). As part of a state statute, this section could thenceforth be amended or completely repealed by the enactment of legislation rather than the more difficult procedure necessary to amend the Constitution.

The removal of the substance of Section 11382 from the California Constitution's provisions on recall is the most powerful indicia of severability. The people of California evidently believed the provisions of Section 11382 were not necessary to continue to effectuate the recall procedures as they severed them from the Constitution and relegated them to statutes that could be repealed more easily, even without voter consent. Notwithstanding what a few legislators had in mind in 1911, the California voters did not attribute such significance to the requirement that one must first vote on the recall question in order for one's vote on a successor to count.

Indeed, the California Constitution retains the provision that a recalled officer may not run to replace himself. West's Ann. Cal. Const. Art. II, § 15(c) (2002) ("The officer may not be a candidate ...."). While this provision was deemed essential, the provision in Section 11382 was not.

■ Under settled California Supreme Court law, an invalid recall provision is severable if the remainder of the recall initiative would likely have been adopted by the people had they foreseen the invalidity of the provision. *Gerken* at 716, 25 Cal.Rptr.2d 449, 863 P.2d 694. As stated

---

**7.** In *Rossi v. Brown*, the California Supreme Court noted that when construing constitutional provisions:

[T]he intent of the drafters may be considered by the court if there is reason to believe that the electorate was aware of that intent ... and we have often presumed, in the absence of other indicia of the voters' intent such as ballot arguments ... or contrary evidence, that the drafters' intent and understanding of the measure was shared by the electorate.... The historic context in which a measure is drafted is also relevant in construing the 1911 amendments which added the initiative, referendum, and recall to the Constitution. We have found the views of Franklin Hichborn, a contempo-

rary observer of the 1911 and subsequent legislative sessions, to be particularly illuminating.

9 Cal.4th at 700 n. 7, 38 Cal.Rptr.2d 363, 889 P.2d 557 (internal citations omitted). There is no evidence as to what was actually conveyed to the electorate in 1911 concerning the recall provisions. Moreover, Hichborn's account may aid in interpretation, but not on the question of volitional severance. Most importantly, whatever was the intent in 1911, the voting requirement of Section 11382 was in fact severed from the Constitution in 1974.

**8.** The ballot materials regarding Proposition 9 are available at *http://holmes.uchastings.edu/ballot pdf/1974g.pdf*.

by the California Supreme Court in *Santa Barbara Sch. Dist. v. Superior Court*, 13 Cal.3d 315, 331–332, 118 Cal.Rptr. 637, 530 P.2d 605 (1975), "If the remainder of the law reflects a substantial portion of the electorates' purpose that part should be severed from the invalid provision and given effect." Stated another way, "the test is whether it can be said with confidence that the electorate's attention was sufficiently focused upon the parts to be severed that it would have separately considered and adopted them in the absence of the invalid portions." *Gerken* at 715–716, 25 Cal.Rptr.2d 449, 863 P.2d 694 (quoting from *People's Advocate, Inc. v. Superior Court*, 181 Cal.App.3d 316, 332–33, 226 Cal.Rptr. 640 (1986)).

Here there is no reason to believe that the California voters did not want the remaining recall procedure in the absence of Section 11382. Therefore, the invalidity of Section 11382 does not affect the validity of the remaining recall provisions in the California Constitution and Elections Code and Rafferty's request to either vacate the injunction and allow the recall election to proceed with Section 11382 operational or enjoin the entire recall election is denied.

## C. COURT'S POWER TO ISSUE AN INJUNCTION

 Rafferty argues that legal precedent, including Supreme Court cases, precludes injunctive relief against imminent elections, even where the right to vote has been abridged. Clearly, this is not the case. *See, e.g., Hamer v. Campbell*, 358 F.2d 215 (5th Cir.1966) (holding that the district court should have enjoined an election where a number of African–Americans were denied the right to register to vote as a result of Mississippi laws imposing a four-month registration requirement and a poll-tax requirement).

. The cases Rafferty cites do not support the proposition that a court cannot issue injunctive relief in connection with an imminent election. For example, in *Chisom v. Roemer*, 853 F.2d 1186 (5th Cir.1988), the court held that it would not be proper to enjoin a judicial election, in large part because of uncertain consequences to Louisiana's judicial system. However, the court noted: "It cannot be gainsaid that federal courts have the power to enjoin state elections." *Id.* at 1190.

Rafferty's reliance on the Supreme Court cases is similarly misplaced. None of these cases hold that an injunction is an improper remedy in the face of unconstitutional election laws. In *Fortson v. Morris*, 385 U.S. 231, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966), the Supreme Court reversed the three-judge district court panel's order enjoining the state assembly from electing a governor because the Supreme Court found the challenged election law to be constitutional. In *Whitcomb v. Chavis*, 396 U.S. 1064, 90 S.Ct. 761, 24 L.Ed.2d 757 (1970), the Supreme Court stayed pending appeal the district court's order which redistricted the state. The Court did not hold that district courts cannot enjoin elections. The caselaw is replete with instances where federal courts have issued injunctions against unlawful election practices. *See, e.g., Lucas v. Townsend*, 486 U.S. 1301, 1303–05, 108 S.Ct. 1763, 100 L.Ed.2d 589 (1988) (Kennedy, J., Circuit Judge) (enjoining election); *Gilmore v. Greene County Dem. Party Exec. Comm.*, 368 F.2d 328 (5th Cir.1966) (staying election).

 At any rate, here, the Court is not enjoining an election. Rather it is enjoining the refusal to count certain votes. Again, it is well-established that federal courts may take such actions. *See, e.g., Matsumoto v. Pua*, 775 F.2d 1393, 1398 (9th Cir.1985) (reversing district court and ordering entry of injunctive relief on remand that prohibits enforcement of Section 12–203 of election law); *Perry v. Bartlett*, 231 F.3d 155, 162 (4th Cir.2000)

(permanently enjoining State from enforcing Section 12A of Election Law given violation of First Amendment); *California Democratic Party v. Lungren,* 919 F.Supp. 1397, 1405 (N.D.Cal.1996) (permanently enjoining enforcement of Article II, Section 6 of California Constitution in state elections).

### D. *INJUNCTION AS APPLIED TO LOCAL JURISDICTIONS*

██ Rafferty also claims that the Court's injunction improperly covers the recall of local officials because "Plaintiffs lack standing since they fail to allege that they reside within any local jurisdiction subject to § 11382 ...." Rafferty Complaint at ¶ 24. Rafferty has not presented any support for his implicit proposition that Section 11382 is applied any differently to local recall elections than it is in state-wide recall elections. Section 11382 applies to all recall elections in California except those provided for under city or county charters. *See* West's Ann. Cal. Const., Art. II, § 19; *see also* Cal. Elections Code § 11000. Rafferty has not demonstrated that the effect of the application of Section 11382 to local elections is any different than as to state-wide elections or that there is a compelling basis for its application to local elections. Since Section 11382 does not apply to recall elections provided for by a city or county charter, or ordinance adopted pursuant to such a charter, the Court's decision does not affect those recall elections. Therefore, the Court finds no reason to modify its determination that the declaratory and injunctive relief applies to all future recall elections covered by Elections Code, Section 11000.

### E. *INJUNCTION AS APPLIED TO RAFFERTY AS AN INDIVIDUAL*

██ Rafferty alleges that the Court's injunction is overbroad in that it applies to him as a private person and restricts his First Amendment rights. As the Court explained at the hearing on Rafferty's motion to intervene, the injunction was only meant to reach state officials carrying out their official duties. However, in order to prevent any possible further confusion on this issue, the Court will modify the language of its injunction so as to remove any possible reference to the actions of private individuals.

### F. *LACHES/UNCLEAN HANDS*

██ In his Complaint Rafferty alleges that "plaintiffs' claims are barred by the doctrine of laches, in that they failed to seek timely relief, (paras.23, 25) and unclean hands (para.26)." (Rafferty Complaint at ¶ 23.) Both of these arguments lack merit. Rafferty does not allege that Plaintiffs intentionally delayed bringing their suit after the recall election was certified, only that they could have brought their suit earlier. The Court has serious doubts as to whether Plaintiffs' suit would have been ripe for adjudication prior to the official certification of a recall election. In any case, Plaintiffs filed their suit the same day the Lieutenant Governor certified the Davis Recall election. The Court is satisfied that Plaintiffs did not improperly delay filing their claims in this case, and, thus, their action is not barred by the doctrine of laches.

As for Rafferty's unclean hands argument, the complaint in intervention alleges no facts that support the denial of injunctive relief. Therefore, this argument is wholly without merit.

### III. CONCLUSION

The Court has accelerated these proceedings given the extraordinary nature of the matters addressed and to allow for orderly appellate review. The complaint

in intervention is ripe for adjudication on the merits as no facts are in dispute and only purely legal issues remain. Rafferty is not entitled to the relief he seeks, that is, to vacate the injunction as to applying Section 11382 or enjoining the entire recall election. The Court does, however, modify the injunction to clarify that it does not apply to Rafferty or any private citizen. The Court further vacates its July 29, 2003 holding construing the meaning of California Elections Code Sections 11383 and 11384 as unnecessary to a decision in this case and more appropriately left for the California courts. Other than the limited relief granted, judgment shall be entered dismissing Scott Rafferty's complaint in intervention with prejudice.

Although Defendants filed an opposition to Rafferty's motion for judgment on the pleadings, they did not make their own motion for judgment on the pleadings. It is proper, however, for the Court to *sua sponte* enter judgment on the pleadings dismissing the case. The Court set this matter for expeditious resolution on cross-motions for judgment on the pleadings and fully informed all the parties that, if appropriate, the Court would enter a final judgment so that the case would be ripe for appellate review. All three Defendants have filed their answers. Because the Court has determined that there are no factual disputes at issue and Rafferty is not entitled to relief as a matter of law on any of his remaining claims, it is proper for the Court to enter final judgment. *See Flora v. Home Fed'l Sav. & Loan Ass'n,* 685 F.2d 209, 212 (7th Cir.1982) (As long as both parties have the opportunity to be heard, the legal sufficiency of the complaint may also be raised by the court *sua sponte,* and judgment entered accordingly); Schwarzer, Tashima, & Wagstaffe, *Cal. Practice Guide: Fed. Civ. Pro. Before*

*Trial,* § 9:329 (the Rutter Group 2003) (stating the same).

**IT IS SO ORDERED.**